The Old Colony Trust Company *v.* The Allentown and Bethlehem Rapid Transit Company, Mortgagor, and The Allentown and Bethlehem Street Railway Company, The Bethlehem and South Bethlehem Street Railway Company, The Allentown Passenger Railway Company, The Catasauqua and Northern Street Railway Company, The Allentown and Lehigh Valley Traction Company and The New York Guaranty and Indemnity Company, Trustee, Appellants.

*Street railway companies — Mortgage — Foreclosure — Jurisdiction of equity—Acts of May 5, 1876, and March 23, 1877.*

Under the Acts of May 5, 1876, P. L. 123, and March 23, 1877, P. L. 32, the court of common pleas as a court of equity has jurisdiction to entertain a bill to foreclose a mortgage against a street railway company.

*Railroads—The words " railroad " and " railway."*

The words " railroad " and " railway " are synonymous, and in all ordinary circumstances they are to be treated as without distinction of meaning.

*Referee's finding of fact—Conclusiveness of finding.*

A referee's finding of fact which has been confirmed by the court below

has all the force of a verdict of a jury, and must prevail unless error is clearly shown.

*Street railway companies—Mortgage—Bonds—Estoppel.*

Where a street railway company has purchased all the rights, powers, franchises and properties of another street railway company, and, as part of the consideration of the purchase, has covenanted to pay off a specific mortgage which is a lien upon the property, the purchasing company cannot, after it has obtained possession of the property, deny its liability on the mortgage on the ground that it was without consideration.

Argued Jan. 3, 1899.   Appeal, No. 51, Jan. T., 1898, by defendant, from decree of C. P. Lehigh Co., Sept. T., 1895, No. 1, on bill in equity.   Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ.   Affirmed.

Bill in equity to foreclose a mortgage.

The mortgage was executed by the Allentown and Bethlehem Rapid Transit Company, one of the respondents, to the Old Colony Trust Company, the complainant, as trustee, dated March 1, 1894, but not acknowledged and delivered until March 8, 1894.   It purports to be given to secure the payment of 200 bonds of the said Allentown and Bethlehem Rapid Transit Company bearing even date therewith, each for the payment of $1,000, making $200,000, 100 of said bonds being payable one year after the date thereof, and the remaining 100 bonds payable eighteen months after the date thereof, with interest on each of said bonds, payable semi-annually, at the rate of six per cent per annum.

The mortgage also provides that in case default shall be made in the payment of said bonds as they become due, or in the payment of the coupons thereto attached for the semi-annual interest when such payments become due, and such default shall continue for ninety days, under the terms of the mortgage, the whole thereof shall become due, and under certain conditions specified in the mortgage, the trustee may proceed to foreclose by suit or otherwise, in such manner as may be authorized by law for the foreclosure of mortgages on real or personal estate.

The New York Guaranty and Indemnity Company, one of the respondents, was not served.

There was no demurrer filed by either of the respondents to the bill.

The case was referred to John Rupp, Esq., as referee.

The material portions of the referee's findings and the exceptions thereto are stated in the opinion of the Supreme Court.

*Errors assigned* were in overruling exceptions to the referee's report.

*W. S. Kirkpatrick* and *Joseph H. Choate,* with them *Samuel B. Clarke* and *M. L. Kauffman,* for appellant.—The court had no jurisdiction: Schuylkill County v. Minogue, 160 Pa. 165; Adams's App., 113 Pa. 449; Shillito v. Shillito, 160 Pa. 167; Evans v. Goodwin, 132 Pa. 136; Fidelity Co. v. Weitzel, 152 Pa. 498; Harrington Bros. v. Florence Oil Co., 178 Pa. 444; Ashhurst v. Montour Iron Co., 35 Pa. 30; Bradley v. Chester Valley R. R. Co., 36 Pa. 141.

The defendants, Rapid Transit Company and Traction Company, are motor power companies, a class of corporations not enumerated in the statutes, and therefore the foreclosure of these mortgages is not subject to chancery jurisdiction.

The provisions of the Act of May 5, 1876, P. L. 123, are not applicable to passenger railways: Gyger v. Ry. Co., 136 Pa. 96.

The transit company is not averred to be either a manufacturing or a transportation company, nor is there any such averment as would sustain the jurisdiction claimed: Thompson's App., 126 Pa. 367; Morck v. Pa. Gas Co., 8 Pa. C. C. R. 131; Battin v. Martin, 10 Lanc. L. R. 209; Holton v. New Castle Ry. Co., 138 Pa. 111; Adams's App., 113 Pa. 449; Gandolfo v. Hood, 1 Pears. 269.

We complain of the referee's findings of fact so far as they are excepted to and not covered by our various assignments of error, that they are improper and unwarranted deductions and inferences from the evidence, and clearly against the fair and proper effect of the same: Com. v. Stevens, 178 Pa. 561; Mc-Conomy v. Reed, 152 Pa. 42; Sproull's App., 71 Pa. 138; Phillips's App., 68 Pa. 138.

The exact question presented in this case has rarely, if ever before, come before a court for decision. Ordinarily the questions with which courts have had to deal, where the transactions

of common agents and common executive officers and directors of corporations were involved, were questions as to the validity of contracts clearly proved to have been made.   Here the fundamental question is : Was there any contract?   And the incidental question is, What effect shall be given to admissions from which a contract might be inferred when it appears that those admissions were made for a subject corporation in the interest of a dominant corporation, by common officers who, as stockholders of the dominant corporation, had a large personal interest in the matter?   It is submitted that the principles laid down by the courts in the case of contracts apply a fortiori in the case of admissions made under such circumstances: 3 Thompson on Corporations, sec. 4070 ; Ashhurst's App., 60 Pa. 290 ; Library Hall Co. v. Pittsburg Assn., 173 Pa. 30 ; Sage v. Culver, 147 N. Y. 247 ; Rice's Appeal, 79 Pa. 168 ; Wardell v. R. R. Co., 4 Dill. 339 ; 103 U. S. 651 ; Thomas v. Brownville, etc., R. R. Co., 2 Fed. Rep. 877 ; 109 U. S. 522 ; Bill v. Western Union Telegraph Co., 16 Fed. Rep. 14 ; Meeker v. Winthrop Iron Co., 17 Fed. Rep. 48 ; Ervin v. Oregon Ry. & Nav. Co., 20 Fed. Rep. 577 ; Jackson v. McLean, 36 Fed. Rep. 213 ; Davidson v. Railroad Co., 58 Fed. Rep. 653 ; Gamble v. Q. C. W. Co., 123 N. Y. 91 ; Pearson v. Concord Railroad Corp., 62 N. H. 537 ; Parker v. Nickerson, 112 Mass. 195 ; Hoffman Coal Co. v. Cumberland Coal & Iron Co., 16 Md. 456 ; Menier v. Hooper's Telegraph Works, L. R. 9 Ch. App. Cas. 350 ; Taylor on Corp. secs. 636–641.

Failure of consideration is a usual and proper defense upon a mortgage : Good v. Good, 9 W. 567 ; Gilbert v. Hoffman, 2 W. 67 ; Sands v. Codwise, 4 Johns. 536 ; Harrison v. Rowan, 3 Wash. C. C. 580 ; Whitney v. Allaire, 4 Denio, 554 ; Saalfield v. Manrow, 165 Pa. 114 ; 3 Thompson on Corp. sec. 4059 ; Thomas v. Brownville, etc., Ry. Co., 2 Fed. Rep. 877 ; Jackson v. McLean, 36 Fed. Rep. 213 ; Aberdeen Ry. Co. v. Blakie, 1 Macq. H. L. 461 ; Gardner v. Ogden, 22 N. Y. 327 ; Butts v. Wood, 37 N. Y. 317 ; Coleman v. Sec. Ave. R. R. Co., 38 N. Y. 201 ; Stewart v. R. R. Co., 38 N. J. L. 505 ; Gardner v. Butler, 30 N. J. Eq. 702 ; Bill v. Western Union Telegraph Co., 16 Fed. Rep. 14 ; Stewart v. L. V. R. R. Co., 38 N. J. L. 505.

*Edward Harvey* and *W. B. Putney*, for appellee.—The court

had jurisdiction of the bill of complaint: Ashhurst v. Montour Iron Co., 35 Pa. 30; Bradley v. Chester Val. R. R. Co., 36 Pa. 141; Winton's App., 97 Pa. 385; Phila. & Balt. R. R. Co. v. Johnson, 54 Pa. 129; Pa. R. R. Co. v. Sly, 65 Pa. 205; Phila. v. Phila. Pass. Ry. Co., 177 Pa. 379; Columbia Conduit Co. v. Com., 90 Pa. 307; Gas Co. v. Gas Co., 186 Pa. 443; Smith v. Coale, 12 Phila. 177; Adams's App., 113 Pa. 449; Shillito v. Shillito, 160 Pa. 167; Evans v. Goodwin, 132 Pa. 136; Herrington Bros. v. Florence Oil Co., 178 Pa. 444; Edgett v. Douglass, 144 Pa. 95; Fidelity Co. v. Weitzel, 152 Pa. 498; People's Nat. Bank of Pitts. v. Loeffert, 184 Pa. 164.

The bonds were issued and the trust under the mortgage was accepted by the plaintiff in conformity with the express terms of the mortgage: Horan v. Weiler, 41 Pa. 470; Robins v. Bellas, 4 W. 255; Best on Evidence, secs. 346, 347.

The mortgage was legally authorized and the giving of it has been repeatedly recognized and confirmed by the corporation mortgagor: Bredin v. Dubarry, 14 S. & R. 30; Allen v. Kellam, 94 Pa. 253; Negley v. Lindsay, 67 Pa. 217; Pearsoll v. Chapin, 44 Pa. 10; Wright v. Burbank, 64 Pa. 247; Gold-Mining Co. v. National Bank, 96 U. S. 640; Kline v. Beebe, 6 Conn. 494; Kelsey v. Nat. Bank of Crawford Co., 69 Pa. 426; Sheffield, etc., Ry. Co. v. Woodcock, 7 M. & W. 574; Harris v. Knowles, 26 W. N. C. 249; Boston Bank v. Chamberlin, 15 Mass. 220; Hill v. Epley, 31 Pa. 331; 1 Morawetz on Private Corp. sec. 525; Watts's App., 78 Pa. 370; Manhattan Hardware Co. v. Phalen, 128 Pa. 110; Augusta, etc., R. R. Co. v. Kittel, 52 Fed. Rep. 63; Rolling Mill v. R. R. Co., 120 U. S. 256.

The traction company has no right to question this mortgage upon any grounds. It is estopped from making defense: Morris v. Oakford, 9 Pa. 499; Trotter v. Hughes, 12 N. Y. 74; Halsey v. Reed, 9 Paige, 446; Burr v. Beers, 24 N. Y. 178; Lawrence v. Fox, 20 N. Y. 268; Hand v. Kennedy, 83 N. Y. 154; Comstock v. Drohan, 71 N. Y. 9; Campbell v. Shrum, 3 W. 60; Metzgar & Gernert's App., 71 Pa. 330; Taylor v. Preston, 79 Pa. 436; Woodward's App., 38 Pa. 322; Burke v. Gummey, 49 Pa. 518; Keim v. Taylor, 11 Pa. 163; Blank v. German, 5 W. & S. 36; Blood v. Crew Levick Co., 171 Pa. 328; Perrine v. First Nat. Bank, 55 N. J. L. 402; Freeman v. Auld, 44 N. Y. 50; Shufelt v. Shufelt, 9 Paige, 137; American

Waterworks Co. v. Farmers' Loan & Trust Co., 73 Fed. Rep. 956; Ritter v. Phillips, 53 N. Y. 588; Johnson v. Thompson, 129 Mass. 398; Fairfield v. McArthur and another, 15 Gray, 526; Foster v. Wightman, 123 Mass. 100; Parkinson v. Sherman, 74 N. Y. 88; Miners' Trust Co. Bank v. Roseberry, 81 Pa. 309; Stayton v. Riddle, 114 Pa. 464; DeWolf v. Johnson, 10 Wheat. 393; Mathias v. Superior Iron Co., 70 Pa. 160; R. R. Co. v. Church, 108 U. S. 317; 1 Morawetz on Priv. Corp. sec. 227; App. of Third Reformed Dutch Church, 88 Pa. 503; 1 Beach on Priv. Corp. sec. 1, p. 4; Des Moines Gas Co. v. West, 50 Iowa, 16.

The Lehigh Traction Company is estopped from questioning the validity of the bonds and the mortgage : Hyde v. Baldwin, 17 Pick. 308; Thellusson v. Woodford, 13 Ves. Jr. 209; Churchman v. Ireland, 1 Russ. & Mylne, 250; Brown v. Ricketts, 3 Johns. Ch. Rep. 553; Collins v. Woods, 63 Ill. 285; Horton v. Davis, 26 N. Y. 495; Jones v. Building Assn., 94 Pa. 215; Beetem's Admrs. v. Burkholder, 69 Pa. 249; Lyle v. Shay, 165 Pa. 637; Seymour v. S. F. C. Assn., 144 N. Y. 341; Bissell v. R. R. Co., 22 N. Y. 258; Kent v. Quicksilver Mining Co., 78 N. Y. 159; Howard v. Hayes, 47 N. Y. Superior Ct. Rep. 89; Snow v. Alley, 11 N. E. Rep. 764; Willingham v. Hooven & Co., 74 Ga. 233; Merrill v. Wilson and others, 33 N. W. Rep. 716.

The transit company, having no interest in the mortgaged property, having parted with the title to the property as well as to the equity of redemption therein, can be heard in defense only upon the ground of a personal liability for the deficiency, if any, between the amount realized on a sale of the property and the face of the bonds with interest; and to meet that aspect of the case we offer to release that company from all claim for the deficiency, and to rely wholly and exclusively on the mortgage for the payment of the bonds : Hunsicker v. Richardson, 13 Pa. C. C. R. 524; Wilson v. McCullough, 19 Pa. 77.

The findings of the referee approved by the court are conclusive on matters of fact: Com. v. Stevens, 178 Pa. 543; Gibbons v. Gibbons, 175 Pa. 475; Brotherton Bros. v. Reynolds, 164 Pa. 134; Phillips's App., 68 Pa. 130; Stocker v. Hutter, 134 Pa. 23; Morgan's App., 25 W. N. C. 532; Gimber's Est., Com. Title, etc., Co.'s App., 184 Pa. 437; Corcoran's App., 184 Pa. 502; DuBois's App., 184 Pa. 340.

OPINION BY MR. JUSTICE GREEN, October 6, 1899:

While it is true that the defendant company took its charter under the Act of March 22, 1887, P. L. 8, and became incorporated as a company for the construction and operation of motors and cables, or other machinery for supplying motive power to passenger railways, it is also true that under the eighth clause of the 1st section of the act, it had the power "to lease the property and franchises of passenger railway companies, which they may desire to operate, and to operate said railways." And by the Act of May 15, 1895, P. L. 65, it is provided, " That from and after the passage of this act it shall be lawful for any traction or motor company, or street passenger railway company, owning, leasing, controlling or operating different lines of street railways of different companies, to operate as a general system so much of said different lines as occupy streets, and from time to time to lay out such new routes or circuits over the whole or any part of such street or streets occupied by the tracks of the different companies which it thus owns, leases, controls or operates, and upon such routes or circuits to run cars for such distances, and in such directions as will in the opinion of the operating company best accommodate public travel."

The learned referee has found as a fact in his report that the defendant company, in the exercise of its lawful powers under the above cited legislation, became, prior to the execution of the mortgage in question in this case, the lessee of all the railways, railway lines, franchises, and all the property of every nature and character, real and personal, of the Allentown Passenger Railway Company, the Bethlehem and Allentown Street Railway Company, and the Bethlehem and South Bethlehem Street Railway Company, and had full power to operate all of said street railways, the whole of them being distinctively street railway companies. He found also that all of these companies became merged in the defendant company by leases and transfers expressly authorized by law. He also finds distinctly that, ".The effect of these leases and transfers was, that the Rapid Transit Company became the owner, for a period of nine hundred and ninety-nine years from the date thereof, of the whole system of street railways of the said respective street railway companies, and of all their property of every nature and character whatsoever, and thereafter operated the same, and the said

Rapid Transit Company afterwards mortgaged the property so acquired, including its franchises, to the Old Colony Trust Company, Trustee, by the mortgage in question." There is no kind of question under the testimony as to the entire correctness of these findings. Being thus clothed with all the rights, powers, franchises and properties of all the companies named, the Rapid Transit Company, defendant and mortgagor in this case, executed the mortgage now in controversy.

The first question discussed among the numerous assignments of error is the question of the jurisdiction of the court below to entertain the plaintiff's bill.

There can be no doubt that under the Act of May 5, 1876, P. L. 123, general power is conferred upon the courts of common pleas to entertain bills for the foreclosure of mortgages given by railroad companies. The language is, "Each of the several courts of common pleas of this commonwealth shall have and exercise all the powers of a court of chancery in all cases of and for enforcing rights, under mortgages of the property or franchises of any railroad, canal or navigation corporation, where such property or franchises or any part thereof shall be situate or exercisable within the limits of this commonwealth," etc. By the Act of March 23, 1877, P. L. 32, the same chancery power is conferred upon the courts of common pleas in cases of mortgages of the property or franchises of any coal, iron, steel, lumber or oil, or any mining, manufacturing or transportation company. We are very clearly of opinion that the jurisdiction can be maintained in the present case under both of these acts, for the plain reason that the mortgagor company is both a railroad and a transportation company within the plain meaning of both acts. The attempted distinction between "railroad" and "railway" companies has long since been exploded, and indeed never received the sanction of this Court in this class of cases. This is very clearly shown in the report of the referee by the citation of numerous authorities.

In the case of Hestonville, etc., Passenger Railroad Co. v. City of Philadelphia, 89 Pa. 210, it was held that city passenger railway companies are included within the term "railroads" as used in the act of May 16, 1861. In Borough of Millvale v. Evergreen Railroad Company, 131 Pa. 1, we held that there

is no specific definition, either statutory or in common law, of the term "passenger railway," and that "railroad" and "railway" are synonymous terms, and are used in the same sense in the common language of men. In Gyger v. Railway Co., 136 Pa. 96, we held that when either of the words "railroad" or "railway" is used in a statutory or constitutional provision, and the context is without indication that a particular kind of road is intended, the provision will be held applicable to every species of road embraced in the general sense of the word used. We said specially, "It is undoubtedly true, as we have several times decided, that the words 'railroad' and 'railway' are synonymous, and in all ordinary circumstances they are to be treated as without distinction of meaning." In Pa. R. Co. v. Electric Railway Co., 152 Pa. 116, we held that electric railway companies are railroad companies within the purview of the act of June 19, 1871, regulating the crossings of railroads at grade. To the same effect is Rafferty v. Central Traction Co., 147 Pa. 579.

On the question as to what acts were done by the defendant company, under the various leases and transfers of the rights, privileges, franchises and properties of the several street railway companies mentioned, the referee finds that "it operated the entire system of said street railways as one property, carrying passengers from point to point on the several lines thereof, charging fares for so doing, and it performed all the essential functions of a street railway company, and all of this it had a right to do under its charter, and under the act of assembly under which it was incorporated." That the defendant was also a transportation company, under the act of 1877, is too plain for argument. We do not think any further discussion of this branch of the case is required, and we dismiss the assignments of error which relate to this subject.

Recurring now to the merits of the case, we find that the defense set up against the proceeding on the bill is an impeachment of the consideration of the mortgage debt. The mortgage was given to secure the payment of 200 bonds of $1,000 each, and was dated March 1, 1894, though not executed and acknowledged until March 8, 1894. There were two series of bonds, each of $100,000 in the aggregate, the first series falling due March 1, 1895, and the second series

on September 1, 1895.   The proceedings which led up to the execution and delivery of the mortgage and bonds were all regular and lawful in all respects, and are not at all in controversy in this case.   It was found by the referee that the mortgage was a perfectly valid and legal obligation of the Rapid Transit Company, and a careful examination of the report and of the testimony, which was very voluminous on this and other subjects, satisfies us fully that his findings upon this subject are perfectly correct and fully warranted by the testimony.   In the course of the proceedings which resulted in the execution and delivery of this mortgage, it was made to appear that it was given for the purpose of enabling the Rapid Transit Company to secure the payment of debts which had been incurred for matters occurring outside the various written contracts under which the several railroad properties involved were built, but for which the Rapid Transit Company assumed the obligation to pay in consideration of the fact that the various physical structures, properties and works which were thus created were parts of the several railroad systems of which the transit company had become the owners at different times during the few years preceding the execution and delivery of the mortgage and bonds.   These $200,000 of the bonds secured by the mortgage represented part of a larger sum of about $400,000, which represented the amount of this indebtedness, called floating debt of the Rapid Transit Company, and was so declared by the directors, and also the shareholders of said company, at meetings held by them respectively for the purpose of making provision for the payment of this indebtedness.   The preliminary meeting of the directors was held on November 19, 1892, at which a resolution was unanimously passed calling a meeting of the stockholders on January 23, 1893, for the purpose of taking action upon a proposition to increase the capital stock of the company from $1,000,000 to $1,400,000, and the indebtedness of the company from $500,000 to $700,000.   This meeting of the stockholders was held on January 23, 1893, and it was then determined to increase the capital stock as proposed to $1,400,000 and the indebtedness to $700,000, the vote being 7,731 shares, a large majority of the total number of shares issued, and no votes to the contrary. The object of the increase was to raise $400,000 to pay off the

floating indebtedness then existing and in contemplation, the plan being to sell the increase of stock at fifty per cent of its par value, amounting to $200,000, and to sell the increase of bonds, $200,000, at par.

Next after this, and during the year 1893, negotiations were had between the Allentown and Lehigh Valley Traction Company, a competing company with the Rapid Transit Company, on the opposite side of the Lehigh river, and between the same terminal points, and the Industrial Improvement Company, a corporation organized under the laws of New Jersey, and which was the company that furnished the money and built most of the roads composing the system owned by the Rapid Transit Company, and which also held the majority of the stock of the transit company. The purpose of the negotiations was the purchase by the traction company, from the industrial company, of the stock held by the industrial company in the Rapid Transit Company, thus giving the traction company the control and management of the transit company. In the course of these negotiations a committee of experts was appointed to examine into the financial condition and indebtedness of the transit company. This committee consisted of Mr. G. E. Tripp on behalf of the improvement company, Mr. Davies on behalf of the traction company, and Mr. Fisher, the bookkeeper of the Rapid Transit Company. All of them were experienced and skilled accountants, and were selected for that reason by their respective companies. These gentlemen subsequently reported the total indebtedness of the transit company to be $404,501.73. Of this amount they reported that $340,589.24 was due to the improvement company, of which $308,243.10 was represented by promissory notes given by the Rapid Transit Company to the improvement company, and $32,346.14 was represented to be due on the open accounts between the two companies. The remainder of the entire indebtedness of the transit company, to wit: $404,501.73, was reported to be due other parties and corporations. Copies of this report were furnished to each one of the three corporations interested.

The next proceeding of interest in the direct connection of events was a meeting of the directors of the Rapid Transit Company which was held on February 21, 1894, at which a preamble and resolutions were adopted reciting, (1) the stockholders'

meeting on January 23, 1893, at which it was resolved to increase the indebtedness of the company by $200,000, and the capital stock by $400,000 " for the purpose of paying for certain improvements and extensions and additions to the company's works and lines, then made and contemplated ; " (2) that " up to this time no bonds or stock have been issued under said resolution, but extensions and improvements and additions have been made to the lines and works and property of the company, as per the general statement of subject of improvements and expenditures attached to this resolution, which reads as follows."

Then follows the general statement showing the whole detail of the extensions, improvements and expenditures " on the Allentown and Bethlehem Rapid Transit Company's road since the closing of the construction contracts and the completion of the road in September, 1892." These are set forth in nineteen items, consisting of the Rittersville Hotel Company investment, double tracking various portions of the several roads of the system, building and rebuilding several other portions, erection of a power plant, an electric light investment, some purchases of property and other smaller matters not necessary to mention.

The third preamble recites that in making said improvements and investments " an indebtedness has been created, represented partly by notes and partly by open accounts, and by cash advanced, now aggregating $404,501.73, as per schedule hereto attached." The fourth recital declares, " And whereas it is desirable that the said debts may be provided for in some definite form." These preambles were followed by a resolution in these words : " That the officers of the company are hereby authorized to issue notes and obligations of the company for the said indebtedness to the persons entitled thereto, and where they have heretofore issued obligations therefor, their action is hereby ratified. Resolved further, that, if it is deemed desirable by the officers of the company, they are hereby authorized to give such security on the property of the company as may seem necessary to provide for, secure and pay the said indebtedness."

Five days after the passage of the foregoing preamble and resolutions, to wit: on February 26, 1894, a contract was executed between the Industrial Improvement Company and the Allentown and Lehigh Valley Traction Company, by which the

improvement company sold to the traction company 7,200 shares of the stock of the Allentown and Bethlehem Rapid Transit Company at $20.00 per share, and agreed to transfer in addition $10,000 worth, at par, of the preferred stock of the Allentown Electric Light and Power company without price. It was further agreed that the improvement company should acquire and purchase all the debts and obligations of the rapid transit company except mortgage bonds which existed on February 10, 1894, and transfer them to the transit company, and for these the traction company agreed to pay to the investment company $375,000 in the manner set out in the contract, and it was also provided by the contract that the improvement company might cause the transit company to mortgage all its property and franchises to secure the payment of $200,000 of the said $375,000.

The referee finds that in pursuance of this contract and in execution of its terms, the improvement company assigned and transferred to the traction company 7,200 shares of the stock of the rapid transit company which the improvement company held or controlled, for which the traction company paid the improvement company $20.00 per share, as provided in the contract, and transferred also $10,000, at par, of the preferred stock of the Electric Light and Power Company. He finds also that the improvement company acquired and purchased the debts and outstanding obligations, other than mortgage bonds of the rapid transit company not already held and owned by the improvement company, amounting to $400,501.73, as specified in the contract, and that the improvement company assigned and transferred to the traction company obligations of the transit company to the amount of $130,000 and all obligations mentioned in sections 1, 2 and 5 of the sixth clause of the contract, making in all $200,501.73 of the indebtedness of the transit company, and leaving only $200,000 still to be provided for under the terms of the contract, sections 3 and 4. By the terms of those sections these were to be paid, $100,000 thereof on March 1, 1895, and the other $100,000 on September 1, 1895, and in article seven of the contract it was provided that the improvement company may cause the rapid transit company to mortgage all its property and franchises as security for the payment of these obligations, under the terms and

conditions set forth in the contract. The referee further finds that the other terms, provisions and conditions of said contract were fully carried out and performed, and that to secure the obligations mentioned in sections 3 and 4 of article six of the contract, the rapid transit company executed a mortgage to the Old Colony Trust Company of Boston, Massachusetts, which is the mortgage in suit. It was given to secure the payment of 200 bonds of the transit company, of the denomination of $1,000 each, aggregating $200,000, of which $100,000 were payable on March 1, 1895, and the other $100,000 on September 1, 1895. Interest at the rate of six per cent per annum was made payable semi-annually on the bonds, and it was provided in the mortgage that in the event of default being made in the payment of interest or principal for ninety days after maturity, the whole should become due and payable. The referee finds that default was made in the payment of interest due on September 1, 1894, and March 1, 1895, and also in the payment of the principal due on March 1, 1895, and such default continued for a period of more than ninety days, and the default was not waived, and thereupon the whole amount of the mortgage, principal and interest was due when the present bill in equity was filed and still is due and unpaid.

As has been said heretofore, the defense against the mortgage set up in the answer is an impeachment of its consideration by an averment that the bonds for $200,000, which the mortgage was given to secure, were not valid obligations, for the reason that the indebtedness of the transit company to the improvement company for which the bonds were given was fictitious and fraudulent. It was also alleged by way of defense that the bonds were certified by the trustee in violation of article ten of the mortgage.

We are clearly of opinion that neither the transit company nor the traction company is competent to make any such defense. The referee has found as a fact, and it is true beyond all question, that every part of the contract between the improvement company, who held all the bonds, and the traction company was fully performed, except the payment of the bonds for $200,000 secured by the mortgage. All the securities and all the properties which were to be delivered by the improvement company to the traction company, were in fact delivered

according to the terms of the contract, and the traction com-
pany accepted and took possession of, and still holds possession
of, all of them under the contract, and no return of any part of
the properties or securities has ever been made or tendered, but
on the contrary the traction company is now enjoying every
right, privilege and property conferred upon, and vested in, it
under and by virtue of the express terms of the contract. There
are so many reasons why such a defense cannot be made in
such circumstances, and the authorities supporting this propo-
sition are so exceedingly numerous, that it is quite embarrass-
ing to undertake a classification of the reasons or a citation of
the authorities. They are all most thoroughly and fully pre-
sented in the extremely able and exhaustive report of the
learned referee, but they are entirely too voluminous to be com-
passed within the reasonable limits of a judicial opinion. A
hasty recounting of some of the more important of them must
suffice. In the first place it must be borne in mind that the
improvement company was and is a creditor of the transit com-
pany in respect of the whole amount of the indebtedness for
which these bonds were given, and for a very much larger
amount, and for the entire sum of all this indebtedness,
$400,501.73, the traction company solemnly and formally agreed
to become responsible and to pay $375,000, and by specific men-
tion agreed in the seventh article of the contract of December 31,
1894, between the transit company and the traction company,
to pay these very $200,000 of bonds which it now refuses to
pay. That article is in the following words: "The said trac-
tion company hereby agrees and covenants to and with the said
transit company that it, the said traction company, will and
hereby does, assume to pay and provide for all of the present
existing funding and floating debt of the said transit company,
including the $700,000 of bonds secured by the first and second
mortgages of the transit company to the Old Colony Trust
Company of Boston, for $500,000 and $200,000, and herein
more specifically referred to and described." It must be re-
membered that this last contract was not made until Decem-
ber 31, 1894, fully ten months after the contract between the
traction company and the improvement company was executed,
and long after the traction company had gone into possession
of all the securities, properties and franchises delivered to it by

the improvement company under the principal contract of February 26, 1894. It is not possible to imagine a more distinct and unequivocal ratification and confirmation of a liability which was fully contracted for and established by the preceding original contract, than this.

Moreover, the referee has affirmatively and positively found the fundamental and vital fact, that all the notes and obligations given by the transit company to the improvement company for which, in part, the $200,000 of bonds were given, were valid legal obligations of the transit company, given in good faith, for actual indebtedness incurred by the transit company, and in force on February 10, 1894. As this is one of the most, if not the most, important findings made by the referee, we give it entire.

Premising that there were outstanding at the date of the contract, February 26, 1894, twenty-five notes of the transit company which were to be surrendered to the Old Colony Trust Company, trustee, and for which bonds were to be issued for $200,000, to be secured by the mortgage in suit, the referee finds that " the said twenty-five notes, numbered from one to twenty-five inclusive, thus surrendered to the Old Colony Trust Company, the trustee in said mortgage, for cancelation, and for which said bonds were certified and delivered to the said Industrial Improvement Company, were all notes of the Allentown and Bethlehem Rapid Transit Company payable to said improvement company, and were all either outstanding on February 10, 1894, or substitutes or renewals of notes then outstanding, or notes issued thereafter against the balance due on the open accounts of the said rapid transit company to the said improvement company on that date. All of the said notes were valid and legal obligations of the said rapid transit company to the said improvement company on said February 10, 1894, for work and materials theretofore done and furnished, and for money theretofore paid and advanced to and for the said rapid transit company by the said improvement company. And the referee further finds that the total amount of the indebtedness bona fide due and owing by the said rapid transit company to the said improvement company on said February 10, 1894, properly and legally chargeable against the said rapid transit company, was $340,589.24, at least, and that the total

indebtedness of the said rapid transit company, at that date, including the amount due the said improvement company, was about $400,501.73, the amount fixed in said contract of February 26, 1894."

As this finding is fatal to the defendant's contention, and is the chief point of attack in the argument for the appellant, it will be desirable to recur with as much brevity as is practicable to at least some of the considerations which support it. They are all fully and convincingly set forth in the report of the referee, and it will not be necessary to do more than indicate them.

As the finding is one of fact which has been confirmed by the court below it has all the force of the verdict of a jury, and must prevail unless error is clearly shown. The application of this rule is resisted in the appellant's argument upon the ground that the finding is but a mere inference from facts which are not disputed, and is therefore not binding upon the court which can draw its own inferences. We do not consider this point is well taken, because the finding is a distinct finding upon specific testimony, and depended upon the credibility of witnesses, which also the referee distinctly found. The chief contention of the appellant is that the various accounts of the indebtedness of the defendant were fictitious and fraudulent, because there was no previous contract or agreement that the improvement company was to do this work and make these expenditures for the transit company, but as between them the improvement company "was bound to bear the burden of." On this subject the referee finds directly against the proposition thus advanced. He thus states the question: "This of course involves the question of the substantial correctness of the indebtedness of the Rapid Transit Company on February 10, 1894, as reported by the expert accountants, $404,501.73, of which amount $340,589.24 was reported to be due the improvement company. The balance of said indebtedness due to outside parties is not disputed. If the amount thus reported to be due the improvement company was a valid indebtedness of the Rapid Transit Company then it follows that the twenty-five notes surrendered by the improvement company to the trustee for cancelation, at the time the bonds were certified and issued, were valid obligations, and the validity of the bonds and the mortgage in suit must be sustained."

The referee then proceeds to show (1) by the action of the directors of the transit company in calling the meeting, on November 19, 1892, of the stockholders, to be held on January 23, 1893, to vote upon the question of the increase of the mortgage debt from $500,000 to $700,000, " to meet the liabilities and obligations then already incurred, and thereafter to be incurred, by the company for additions, extensions and improvements then already made and thereafter to be made," that it was intended both by the directors, and afterwards by the stockholders, to create this very mortgage debt, for works, structures and property of the transit company and for which it was responsible.    He refers to the testimony of Mr. Wright, a director and stockholder, and also counsel for the transit company and also a witness, having the best means of knowing for what that indebtedness was, and was intended to be, created, and it is beyond all question that the testimony of this witness does most emphatically sustain the finding of the referee on this subject.    The referee finds (2) " the undisputed fact that the additions, extensions and improvements to the works and property of the company thus contemplated, and for which the funds thus intended to be provided for, were actually made and completed, and the expenditures therefor actually incurred."    As there is no dispute as to the correctness of this finding it needs no discussion, but its effect upon the contention of the appellant is of the gravest consequence.    For if the directors and stockholders of the transit company knew that this company had already incurred part of the indebtedness for these additions, extensions and improvements, and intended to incur still greater indebtedness for the same purpose, and actually did prosecute the work contemplated, and did incur the indebtedness of the whole amount thereof for this very purpose, and then did give the mortgage in suit for the express purpose of securing the payment of this identical indebtedness, how is it possible to say that the debt thus secured was not intended to be, and was not in reality, the debt of this company but of the improvement company?    It is certainly impossible to sustain the contention of the appellant on this subject, no matter in what manner the accounts are handled and rearranged, with a purpose in view to reach the conclusion that the indebtedness in question was not in point of fact the indebtedness of this

company. But the referee finds (3) that the whole subject of this indebtedness was referred to three most accomplished and highly skilled experts, one representing each of the three companies concerned, who " were appointed for the special purpose of ascertaining the amount of " this very indebtedness, and that they proceeded to do so, and finally made a full report, in which all concurred, and in which they set forth the indebtedness of the transit company as already stated and including the very items which made up the amount for which at first the obligations of the company were given, being twenty-five notes aggregating $200,000 which were acquired by the improvement company, and for which the bonds secured by the mortgage in suit were given. We do not propose to take up the details of this report and treat them separately. It certainly is not necessary. Mr. Tripp, the expert selected by the transit company, was examined as a witness, and he fully sustained the correctness of the report. He was examined and cross-examined at the greatest length, and especially as to the items in regard to which the appellant's contentions are made. The referee founds his conclusions upon this subject largely upon the testimony of this witness, and this is the way he sums up his views of the witness and his testimony: " Mr. E. G. Tripp was called and examined as a witness, first on behalf of the respondents, and afterwards on behalf of the complainants in rebuttal. Mr. Tripp was called as an expert accountant and examined as such, and his examination in chief and his cross-examination were very lengthy and very exhaustive. His examination shows that he is a very competent accountant, and he testified with entire frankness and fairness, and in the course of his examination he certainly made the impression upon the referee as being an absolutely truthful and reliable witness. If the testimony of Mr. Tripp is to be believed, and there is absolutely nothing at all in the case to throw any doubt upon its truthfulness or correctness, then there must be an end of this branch of the case." In view of these comments and in view also of the testimony of the witness upon the controverted points, it is idle to say that the findings of the referee are mere inferences from undisputed facts, or that the findings did not include as well the testimony as the credibility of the witness. The referee further discusses the testimony of the witness in detail

in regard to the very items which were challenged by the appellant in the hearing before the referee, and which are now controverted and discussed in the argument for the appellant, and he shows with conclusive force the correctness of the findings on these topics which he ultimately reached, and thus concludes : " The fact is thus demonstrated beyond doubt or question that no part of the expenditure incurred, or that the improvement company was obliged to incur under the construction contracts, entered into, or formed a part of, the indebtedness of the Rapid Transit Company to the improvement company on February 10, 1894, and that no part thereof enters into the consideration of the obligations to secure which the bonds and mortgage in question were given." Having read and considered the testimony of this witness, and the findings of the referee in relation to the matters which are now contested, and having read and carefully considered the arguments and contentions of the learned counsel for the appellant, the writer is obliged to say that he regards the findings of the referee entirely correct upon all these matters of contention, and that they are abundantly sustained by the testimony. In fact he does not see how any other or different conclusions could be sustained. After a further statement by the referee of the extent and character of his investigations of the testimony, and a careful and full consideration of the questions raised by counsel on this subject, he presents his final deduction relative to the twenty-five promissory notes given by the transit company to the improvement company and the bonds given in exchange therefor in these words : " It of course follows from this that the twenty-five promissory notes of the Rapid Transit Company given to the improvement company, which were surrendered to and canceled by the trustee, when the bonds, to secure which the mortgage in suit was given, were certified and issued by the trustee in the mortgage, were valid and legal obligations of the Rapid Transit Company due and owing to the improvement company, and the validity of the bonds and mortgage in question in this suit must be sustained."

It will thus be seen that the observations heretofore made fully sustain the proposition that this defendant, having asserted to its creditor, the improvement company, in different and conclusive methods, the entire validity of the bonds secured by the

mortgage in suit, and having obtained the full consideration derived from that assertion, cannot now be permitted to allege the contrary.

But in the second place it is also established by the report of the referee in the matters heretofore considered that upon the merits of the appellant's contentions the facts are determined against them.    It is not necessary to repeat either the findings or the testimony which supports them.    There is in our opinion no ground for the contention that there was any falsehood, fraud or deceit in the handling of the accounts out of which the obligations in suit arose, and therefore there is no support for the proposition that there was no valid consideration for the mortgage bonds in question.    While these conclusions fully dispose of the appellant's contentions, there is another proposition which is, if possible, still more fatal to the appellants' claim.    It is this.    The real defendant actively engaged in this case is the Allentown and Lehigh Valley Traction Company.    It is that company which is seeking to escape the payment of the $200,000 of bonds secured by the mortgage in suit.    It is that company which became the purchaser of all the stocks, bonds, properties, rights and franchises held by the transit company, which included all those of the subordinate companies, and it is that company which, having become clothed with all the rights, powers, franchises and properties, including the equity of redemption of the mortgage in suit, under and by force of its contracts of purchase, both with the improvement company on February 26, 1894, and with the transit company on December 31, 1894, now seeks to evade the payment of $200,000 of the purchase money, the whole of which it especially agreed to pay by both of the contracts referred to.    Both of these contracts have been heretofore stated and discussed, and no further reference to them is now needed than to say that, by the third and fourth clauses of article six of the contract with the improvement company the traction company expressly agreed to pay the very $200,000 of obligations for which the bonds for the same amount were given.    And by the seventh clause of the agreement between the improvement company and the traction company dated December 31, 1894, the traction company agrees and covenants that it, the said traction company, will assume and pay all the debt of the transit company including both the mortgages for $500,000

and $200,000.   And again by mortgage dated January 2, 1895, executed March 7, 1895, the traction company made a mortgage for $2,000,000 to the New York Guaranty and Indemnity Company, trustee, reciting that the traction company had assumed to pay the first and second mortgage bonds of the transit company, and providing that the said trustee should hold 200 of said bonds from 1301 to 1500, both inclusive, and aggregating $200,000, " for the purpose of redeeming and purchasing the second mortgage bonds hereinbefore mentioned of the Allentown and Bethlehem Transit Company."   It is impossible to imagine a more absolute and peremptory recognition and engagement, repeated several times over, in the most solemn and binding instruments, to assume and pay a specific debt than is disclosed on this record.   Under all the authorities in circumstances such as are here present, such a party is absolutely estopped from denying its liability.   The decisions are most numerous and cannot be at all questioned.   A reference to a very few of them will suffice.   The general doctrine is well stated in 15 Am. & Eng. Ency. of Law, 836 : " A purchaser who has assumed to pay a mortgage debt on the land cannot dispute the validity of the mortgage.   He accepts the debt with the conveyance of the property, as a charge upon the same, and he cannot avoid liability on the ground that the mortgage was without consideration, and therefore not a valid claim against his grantor, or that by reason of a mistake in the description of the premises, he acquired no legal title where he had already obtained possession of the premises and could have had the mistake corrected.   Nor can he show that the mortgagee has other security for the same debt, or that the debt is different, or that the mortgage debt he assumed is not due, or that the mortgage was defectively executed, or show any other reasons for escaping the liability he has assumed."   A large number of cases in support of the text are cited in the notes : Parkinson v. Sherman, 74 N. Y. 88.   A purchaser of mortgaged premises who takes a deed thereof subject to the mortgage and assumes and agrees to pay the same is estopped from contesting the consideration or validity of the mortgage, and when the mortgage was given by his grantor to secure part of the purchase money upon the purchase by him, said grantee, so long as he remains in quiet and peaceful possession, cannot defend against the mort-

gage because of failure of title : Fairfield/v. McArthur, 15 Gray,
526. Fraud practiced by a mortgagee upon his mortgagor, in
obtaining the mortgage, cannot be set up by one claiming under
a quitclaim deed from the mortgagor, in defense of an action
by an assignee of the mortgage even if the assignee took the
mortgage with notice of the fraud. In American Water Works
Co. of Illinois v. Farmers' Loan and Trust Company, 73 Fed.
Rep. 956, decided by the circuit court of appeals, in 1896, the
Court said : " The New Jersey company, we think, is estopped
from asserting the invalidity of the mortgages executed by its
predecessor, the Illinois company, by virtue of the well estab-
lished rule that a purchaser of property who accepts a convey-
ance thereof, which describes incumbrances existing thereon,
and expressly declares that the conveyance is made subject
thereto, will not be allowed to question the validity of such
incumbrances. One who thus buys property has no right to
challenge the validity of a mortgage lien existing thereon at the
date of his purchase, which his grantor did not see fit to chal-
lenge, but recognized in the most formal manner by declaring
that he conveyed the property subject to the existing lien. . . . .
As between the grantor and grantee in a conveyance made sub-
ject to an existing mortgage, the amount of the incumbrance
should be regarded as a part of the purchase price left unpaid
at the date of the conveyance which the grantee undertakes
to pay."

All of our own decisions are to the same effect. A very
recent one, Blood v. Crew Levick Co., 177 Pa. 606, decides that
when a grantor conveys land by his deed upon terms and con-
ditions stated therein, the grantee by accepting the deed consents
to its conditions, and he is bound by them as fully as he could
have bound himself by signing and sealing the covenants and
conditions contained in the deed, and they may be enforced by
the persons in whose behalf they are made with substantially the
same effect. A grantee of land who accepts a deed made "un-
der and subject to the lien " of a mortgage given by his grantor,
and " subject to the payment of the mortgage " is a purchaser
as between himself and his grantor of the entire estate, and is
liable to pay the mortgage as part of the purchase money due
from him. In Morris v. Oakford, 9 Pa. 499, BELL, J., deliver-
ing the opinion, said: " By his covenants to pay the amount of

the mortgage, and the interest accruing thereon, as a part of the purchase money of the premises conveyed by M. and R., B. made the debt his own as between himself and his vendors: Campbell v. Shrum, 3 W. 60 ; Blank v. German, 5 W. & S. 36. But as they still stood bound for it to P. the relation of principal and surety was established as between them and B. immediately on the execution of the conveyance, though each continued liable to P. as principal debtor." In Burke v. Gummey, 49 Pa. 518, we held that a vendee of property taken expressly subject· to a mortgage makes the debt his own, and if on sale upon the mortgage there is a deficiency which the vendor is obliged to pay on his bond, he may recover in an action against the vendee. To the same effect are Metzgar and Gernert's Appeal, 71 Pa. 330, and Taylor v. Preston, 79 Pa. 436. In Kennedy v. Borie, 166 Pa. 361, we held that where a person takes title to land subject to two mortgages, he cannot at a subsequent sheriff's sale under the first mortgage, buy in the property and hold it divested of the lien of the second mortgage. In Miners' Trust Co. Bank v. Roseberry, 81 Pa. 309, Wren borrowed money at usurious interest and gave a bond for its payment, on which judgment was entered. He was afterwards adjudged a bankrupt, and his land was sold by the assignee subject to the judgment. Held, that the purchaser could not have the judgment reduced by the amount of the usury. The purchaser having bought subject to the judgment is presumed to have paid as much as the amount of the judgment less than he would have done. To the same effect is Stayton v. Riddle, 114 Pa. 464, and Mathias v. Superior Iron Co., 70 Pa. 160.

These decisions might be multiplied, but it is not necessary, as there can be no question as to the law upon this subject.

We find no error in the rulings of the referee on the subject of the production of books and papers. The reasons for his action in these matters are fully set forth in his report, and they are undoubtedly correct. It is not necessary to repeat them here.

The same must be said as to his action on the subject of fees, commission, costs and expenses. They are all provided for in the terms of the mortgage, and the referee's rulings are strictly within those terms. Upon the whole case we are clearly of opinion that the report of the referee is a wise, just and entirely

correct determination of all the questions arising before him. His report has been considered and passed upon by the learned court below, and is fully approved and confirmed by that tribunal.    Not only for that reason, but because, after a most patient and careful study of the report, we are thoroughly satisfied with its findings of fact and conclusions of law, and firmly believe it to be the only proper solution of the pending matters in controversy.

The assignments of error are all dismissed.

The decree of the court below is affirmed and the appeal is dismissed at the cost of the appellant.