J-S56003-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| PHILIP ADAMS, JR., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| DURA-BOND PIPE, LLC A/K/A DURA-BOND PIPE, DURA-BOND INDUSTRIES, INC. A/K/A DURA-BOND INDUSTRIES, | |
| Appellee | No. 498 MDA 2015 |

Appeal from the Order Entered February 19, 2015
In the Court of Common Pleas of Dauphin County
Civil Division at No(s): 2012 CV 480 CV

BEFORE: SHOGAN, JENKINS, and PLATT,* JJ.

MEMORANDUM BY SHOGAN, J.:          **FILED NOVEMBER 06, 2015**

Philip Adams, Jr. ("Adams"), appeals from the February 19, 2015 order granting the motion for summary judgment filed on behalf of Dura-Bond Pipe, LLC, also known as Dura-Bond Pipe and Dura-Bond Industries, Inc., also known as Dura-Bond Industries ("Dura-Bond"). We affirm.

The trial court set forth the relevant facts and procedural background of this matter as follows:

> Before the Court is the Motion for Summary Judgment on behalf of [Dura-Bond], and [Adams's] Response. Oral Argument was held on February 9, 2015.

---

* Retired Senior Judge assigned to the Superior Court.

This claim arises from an injury suffered by [Adams] on March 8, 2010, while he was working at the Steelton location of Dura-Bond. At the time of the injury [Adams] was on the payroll of an employment agency, Capital Impact, Inc. d.b.a. Express Employment Professionals (Express). [Adams] began working at Dura-Bond on March 4, 2010, after having been referred to Dura-Bond as a fabricator from Express. The referral was made pursuant to a contract between Express and Dura-Bond dated August 15, 2008.

Trial Court Memorandum and Order, 2/19/15, at 1-2. The trial court concluded that Adams was barred from filing suit against Dura-Bond because he was a borrowed employee. As a borrowed employee, Adams's exclusive remedy was to pursue a claim under the Workers' Compensation Act, 77 P.S. §§ 1-2708. The trial court granted Dura-Bond's motion for summary judgment in an order filed on February 19, 2015, and this timely appeal followed. Both Adams and the trial court have complied with Pa.R.A.P. 1925.

On appeal, Adams raises the following issues for this Court's consideration:

1. Did the trial court err as a matter of law and abuse its discretion by finding that Adams was a borrowed employee of Dura-Bond?

2. Did the trial court err by accepting disputed material facts as true?

Adams's Brief at 6. Because Adams combines the argument on these issues in his brief, we address the issues concurrently. Our scope and standard of review are as follows:

Our scope of review of an order granting summary judgment is plenary. We apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered.

Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of his cause of action. Thus, a record that supports summary judgment will either (1) show the material facts are undisputed or (2) contain insufficient evidence of facts to make out a prima facie cause of action or defense and, therefore, there is no issue to be submitted to the fact-finder. Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions. The appellate Court may disturb the trial court's order only upon an error of law or an abuse of discretion.

***DeArmitt v. N.Y. Life Ins. Co.***, 73 A.3d 578, 585-586 (Pa. Super. 2013)

(internal citations and quotation marks omitted).

Here, the trial court determined that Adams was a borrowed employee. A borrowed employee is defined as follows:

The test for determining whether a servant furnished by one person to another becomes the employee of the person to whom he is loaned **is whether he passes under the latter's right of control with regard not only to the work to be done but also to the manner of performing it.** The entity possessing the right to control the manner of the performance of the servant's work is the employer, irrespective of whether the control is actually exercised. Other factors which may be relevant include the right to select and discharge the employee and the skill or expertise required for the performance of the work. The payment of wages may be considered, but is not a determinative factor. Although the examination of these factors guides the determination, each case must be decided on its own facts.

*Mullins v. Sun Co., Inc.*, 763 A.2d 398, 400 (Pa. Super. 2000) (citing *JFC*

*Temps, Inc. v. Workers' Compensation Appeal Board*, 680 A.2d 862,

864 (Pa. 1996)) (emphasis added).

Moreover:

A statutory employer is a master who is not a contractual or a common-law one, but is made one by the Workers' Compensation Act. *McDonald v. Levinson Steel Co.*, 302 Pa. 287, 153 A. 424, 425 (1930). As our Commonwealth Court has explained, the statutory employer defense is a legal fiction, based entirely upon a statute passed in the early part of the twentieth century, created to assist the Pennsylvania worker by assuring coverage for that worker under the Workers' Compensation Act. *Peck v. Del. Cty. Bd. of Prison Inspectors*, 765 A.2d 1190, 1192 (Pa. Cmwlth. 2001). Specifically, statutory employer immunity arises from section 203 of the Workers' Compensation Act, which declares:

An employer who permits the entry upon premises occupied by him or under his control of a laborer or an assistant hired by an employe or contractor, for the performance upon such premises of a part of the employer's regular business entrusted to such employe or contractor, shall be liable under the Workers' Compensation Act to such laborer or assistant in the same manner and to the same extent as to his own employe.

77 P.S. § 52[.]

*Shamis v. Moon*, 81 A.3d 962, 969 (Pa. Super. 2013) (internal quotation

marks omitted).

The trial court addressed the issue as follows:

The Staffing Agreement between Express and Dura-Bond provides that Dura-Bond will supervise, direct, and control the work performed by Express's Associates. (Staffing Agreement at ¶ 3). John Petty, shareholder and Chief Executive of Express,

- 4 -

testified that Dura-Bond was responsible to determine whether Express'[s] associate was working properly, both generally and specifically with regard to the work they would be performing for Dura-Bond. (Deposition of John Petty at pp. 22-23). Mr. Petty also agreed that associates were under the supervision, direction and control of a supervisor at Dura-Bond rather than Express. (Id. at p. 24).

[Adams] testified during his deposition that a supervisor at Dura-Bond would tell him what needed to be done. (Deposition of Philip Adams at p. 19). Ryan [N]orris, who is a general manager at the Dura-Bond facility in Steelton, testified that he would supervise temporary employees, the work that they did, and the manner [in which] they performed it. (Deposition of Ryan [N]orris at p. 15-16.) Mr. [N]orris further testified that if a temporary employee did something incorrect he would dismiss them. (Id. at p. 16).

Viewing the record in the light most favorable [to Adams], as we must, we find that Dura-Bond had right of control with regard to not only to the work that [Adams] performed, but also to the manner [in which] he performed it. Dura-Bond had the absolute right to select and discharge Express associates and to determine whether the associate had the skill or expertise required by Dura-Bond for the performance of the work. Dura-Bond had the absolute right to dismiss [Adams] as a worker at its facility at any time for any reason. While [Adams] had some skill as a welder and his wages were paid by Express, these factors do not outweigh Dura-Bond's right of control over him.

Trial Court Memorandum and Order, 2/1/15, at 3-4 (internal quotation marks omitted).[1]

_____

[1] Additionally, we point out that while Adams labels himself a skilled employee, "the mere fact that the employee is skilled does not, in and of itself, establish that the original employer has retained the right to control the manner of performance of the work assigned." **Mullins**, 763 A.2d at 401.

- 5 -

Adams disputes some of the factors that the trial court relied upon in concluding that he was a borrowed employee. Adams claims that Dura-Bond did not supervise or direct his work activities. Adams's Brief at 25-26. Adams cites to an affidavit, which was attached to his answer to Dura-Bond's motion for summary judgment, wherein he stated as follows:

> 6. Welding is skilled labor, requiring independent judgment and skill and not the kind of work in which another individual can instruct you on how to perform it.
>
> 7. Fabrication work involves the reading and interpretation of plans, but requires the use of independent judgment and skill as to how those plans will be implemented. It is not simple "connect the dots" type work, but is rather analogous to how an independent builder follows plans drafted by an architect. Many independent decisions are required in following these plans.
>
> 8. I was never given direction or supervision by the Defendants regarding how to follow the plans mentioned in the preceding paragraph.
>
> 9. While at Dura-Bond, I was not directed on how to perform my welding or fabrication work, other than using plans. Instead, I used my own professional judgment.

Adams's Affidavit, 11/13/14, at ¶¶ 6-9.

Viewing this information in the light most favorable to Adams, it does not negate the trial court's findings. The fact that Adams was a welder possessing skills and utilizing independent judgment on his assigned tasks does not support his position. Dura-Bond assigned Adams those tasks and

supervised his work. Adams himself testified that a foreman at Dura-Bond[2] provided the design drawings and told him what to do. N.T., Deposition of Philip Adams, 1/15/14, at 19-28.

Additionally, Adams argues that the testimony given by Dura-Bond's general manager, Ryan Norris, was in dispute, and therefore, the trial court's reliance on this testimony was in error. Adams's Brief at 26-27. Specifically, Adams challenges that part of Norris's testimony wherein he stated that he had the right to, and in fact would terminate temporary workers for poor performance. *Id*. Adams avers that the testimony provided by Express's Chief Executive, John Petty, refuted Norris's testimony regarding which party had the authority to terminate temporary employees. *Id*. However, after review, we agree with the trial court that Norris unequivocally testified that he dismissed poor-performing temporary employees. Trial Court Memorandum and Order, 2/19/15, at 3; N.T., Deposition of Ryan Norris, 1/15/14, at 16. Nothing in Petty's testimony refutes Norris's statement. Rather, the portion of Petty's deposition that Adams cites to is a hypothetical posed by Adams's counsel:

> Q    Would you ever as a result of that pull someone off a particular job for a particular client, do you remember?

---

[2] The foreman's name is Mohamed Sadrafe. N.T., Deposition of Philip Adams, 1/15/14, at 20; N.T., Deposition of Mohamed Sadrafe, 1/15/14, at 6-7. Sadrafe was Dura-Bond's foreman at the time of Adams's work accident. Deposition of Mohamed Sadrafe, 1/15/14, at 7.

A      I do not recall that.

Q      Do you not recall one way or the other, or you just don't recall that? In other words, it may have happened, you just don't know?

A      Specifically in regards to Mr. Adams I do not recall a specific incident.

        Specific to other clientele, if there was attendance issues, them being late, them missing work, them having poor attitude or work ethics, there were associates I did pull off clients based upon my client's directive, that is correct.

Q      How about your associates, you said they're people, you talk to them, if your associates expressed concern about a particular job, would you pull them off, based on what the associate told you could you pull the associate back?

A      I do not recall an instance where that occurred, sir.  It may have, but I do not recall that happening.

Q      Do you believe you could have done that if someone said to you I hate this, I fear for my life, or whatever, that you could have pulled someone off?

A      If that was the case, yes, sir, that would have been something that would have demanded a response.

N.T., Deposition of John Petty, 3/17/14, at 28-29.

This testimony does not stand for the proposition that Express, or Petty on behalf of Express, retained the authority to dismiss temporary employees.  Rather, Petty testified that he would remove a temporary employee at the client's directive.  It was not until Adams's counsel posed the question in terms of "fearing for one's life" that Petty admitted that he may remove an associate, and said "that would have been something that would have demanded a response."  Petty did not say he retained the

control to dismiss an associate who was working for a client, and he did not say that the client could not terminate the associate. Adams's claim to the contrary is meritless.

After review, we agree with the trial court's conclusion and rationale. Adams was a borrowed employee. Dura-Bond controlled the work Adams performed and the manner in which Adams was to perform it. ***Mullins***, 763 A.2d at 400. Therefore, Dura-Bond was not liable to Adams in his tort action, and Adams's exclusive remedy was the Workers' Compensation Act. Accordingly, we affirm the order granting summary judgment in favor of Dura-Bond.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/6/2015